## MINNIE J. THOMPSON

### *v.*

## LAURA C. MINNICH, Exrx. *et al.*

*Opinion filed April 18, 1907—Rehearing denied June 6, 1907.*

1. CONTRACTS—*effect of Married Woman's act of 1861.* The Married Woman's act of 1861 had no effect to change the common law in regard to contracts or conveyances of married women with respect to their separate property, and they were still required, as before, to be joined in by the husband and the execution of the instrument proved by the statutory certificate of acknowledgment.

2. SAME—*restrictions on a married woman's right to make contracts under act of 1861.* While the act of 1861 enlarged the meaning of the separate property which a married woman might own and control as well as the means by which it might be acquired, she was still restricted, in making contracts with respect to her separate property, to such contracts as were necessary or reasonably adapted to the complete enjoyment of the property.

3. SAME—*when contract by married woman is void.* A contract made in 1864 by a married woman without being joined by her hus-

band, by which she agreed, although having no separate property, that a certain child who was being bound out to her by the contract should share equally in her property with her own child, is void, and is incapable of ratification after her disability to make the contract has been removed by statute.

4. SAME—*when a contract cannot be sustained as a contract to make a will.* A contract made in 1864 by a married woman who had no separate property, by which she agreed that a certain child who was being bound out to her should share in her property equally with her own child, cannot be specifically enforced as a contract to make a will, since her power to make a will at that time was expressly limited to her own separate estate, which did not include property subsequently acquired through the death of her husband.

APPEAL from the Circuit Court of Bureau county; the Hon. S. C. STOUGH, Judge, presiding.

Appellant was the daughter of Mary V. Saunders, and when she was about two years old her mother became quite ill, and being in very reduced circumstances, Mary M. McArthur took appellant to her home to care for her during her mother's illness. Mrs. McArthur cared for the child until the mother's health was improved, when she returned her to her mother. It appears from the evidence that when Mrs. McArthur returned the child to its mother, the mother said she was not able to take care of her and asked Mrs. McArthur to keep and care for the child. This Mrs. McArthur consented to do, provided she had some authority, in writing, from the mother, that would enable her to retain the custody and control of the child. Thereupon, on the 15th day of August, 1864, the following agreement in writing was entered into between Mary V. Saunders, mother of appellant, and Mary M. McArthur:

"This indenture, made and entered into on the fifteenth day of August, A. D. 1864, by and between Mary V. Saunders, of the county of Bureau and State of Illinois, of the first part, and Mary M. McArthur, of the same county and State aforesaid, party of the second part:

"*Witnesseth,* that the said party of the first part is the mother of Minnie Jane Saunders, (the father of said Minnie Jane being

now dead,) and believing that it is for the best interest of said child that it be bound out, do hereby agree to bind out said child to Mary M. McArthur till said child shall come of age. And the said Mary M. McArthur is to have full and entire control of said child till such times as it shall come of age. The said Mary McArthur hereby agrees to adopt said child as one of her own children, to clothe, board and educate said child, and take good care of said child in health and sickness, and have it attended in sickness by good physicians.

"The said Mary M. McArthur agrees that if the said child, Minnie Jane, arrives at the age of eighteen years, then the said Minnie Jane is to share equally in the property of the said Mary M. McArthur with her child. Said Mary M. McArthur is to have the privilege of changing the name of said child,—that is, to name the child Minnie Jane McArthur, if the child wishes to adopt that name.

"Given under our hands and seals this 15th day of August, A. D. 1864.

(Five cent stamp.)

MARY V. SAUNDERS,    (Seal.)
MARY M. MCARTHUR.    (Seal.)"

Mrs. McArthur then took appellant to her home and kept and cared for her until her marriage, in 1881, at the age of nineteen years. At the time the above agreement was entered into, Mary M. McArthur was a married woman, living on a farm with her husband, Neal B. McArthur. She continued to reside on the farm with her husband until his death, which occurred in 1891. With the exception of about $100 inherited from her mother, Mrs. McArthur had no estate or property until her husband's death, when she received some means from his estate as widow. Mrs. McArthur had no child, and never had had one, at the time the above agreement was made. About 1870, the appellee Laura C. (now married to Minnich) was born to Mrs. McArthur, and subsequently another child named Grace, but she only lived a short time, and these were the only children ever born to Mrs. McArthur. Mrs. McArthur died in September, 1898, leaving a last will and testament, in and by which she bequeathed to appellant and Agnes Hamrick, a step-daughter, $50 each, and to Neal Benjamin McArthur, who was legally adopted by the McArthurs as their child in August, 1881, a small amount of personal property and $50 in money. The re-

mainder of her personal property she gave to her daughter, Laura C. Minnich, to whom she also gave a life estate in her real property with remainder in fee to the children of her said daughter. At the time of her mother's death Mrs. Minnich had three children, who were joined with their mother, Neal Benjamin McArthur and Agnes Hamrick as defendants to the bill filed in this case. At the time of her death Mrs. McArthur was the owner of real estate worth between $1500 and $2000. She left but little personal property,— not enough to pay her debts. About two years before her death Mrs. McArthur conveyed to her daughter, Mrs. Minnich, by deed, a small portion of her real estate, the value of which is not stated in the testimony, but it is apparent it could not have been of great value.

The amended bill, and the amendment thereto, prayed for the specific performance of the agreement between Mrs. McArthur and the mother of appellant; that the deed executed by Mrs. McArthur to appellee Laura C. Minnich be set aside and declared null and void, and that defendants be decreed to execute to appellant deeds conveying to her one-half of the real estate of the said Mrs. McArthur. The bill was answered, in which answer most of the material averments were denied and as to others the defendants disclaimed all knowledge and called for strict proof. Among other matters set up in the answer is the averment that Mary McArthur was a married woman residing with her husband, Neal McArthur, at the time the alleged contract in question was made, and that she owned no property in her own right and that none ever came to her possession except from her said husband; that the alleged contract was void because of the incapacity of Mary McArthur to enter into the same, and could not be enforced against her personally or against property that she may have subsequently acquired from her husband.

The court below, upon a hearing, dismissed complainant's bill for want of equity, and adjudged the costs, in-

227—28

cluding a guardian *ad litem's* fee of $75 to be paid to the guardian *ad litem* of the children of Mrs. Minnich, against the complainant, from which this appeal is prosecuted.

E. F. THOMPSON, for appellant.

Ora H. PORTER, (GEO. S. SKINNER, guardian *ad litem,*) for appellees.

Mr. JUSTICE VICKERS delivered the opinion of the court:

In the view we take of this case it will only be necessary to consider the question raised as to the capacity of Mrs. McArthur to enter into the contract set out in the foregoing statement.

The contracts of married women under the common law as it existed in England prior to 1870 and in this State until the passage of what is commonly called the Married Woman's act, in 1861, were absolutely void at law, and were equally so in equity so far as imposing any personal obligations is concerned. Subject to certain limitations she might bind her "separate estate," but could not create any personal obligation whatsoever, either in law or in equity. (Page on Contracts, sec. 911; *Brick* v. *Campbell,* 122 N. Y. 337; 25 N. E. Rep. 493; *Snell* v. *Snell,* 123 Ill. 403.) The only mode, at common law, by which a married woman could convey her own real estate or release her inchoate right of dower or other interests in the land of her husband was through the means of fine and recovery, which was a fictitious suit instituted against her, in which a recovery of the land would be permitted and then by a species of estoppel bar her right. This mode of conveyance was abolished in England by act of parliament, (3 and 4 William IV, chap. 74,) which enabled a married woman to convey her real estate by joining with her husband and strictly complying with the requirements of the statute. 1 Washburn on Real Property, p. 102; 2 Kent, p. 151, note *c; Snell* v. *Snell, supra.*

Conveyances by fine and common recovery never prevailed in this State. By an act passed by the territorial legislature in 1807, and an amendment thereto passed in 1813, which were in force when the territory was erected into a State, in 1818, provision was made for the conveyance of a married woman's real estate by joining in a deed with her husband and acknowledging it in the manner prescribed by the statute. (*Mariner* v. *Saunders,* 5 Gilm. 113.) The substance of the statute was re-enacted as section 17 of the Conveyance act in the revision of 1845. Under this statute the execution of a deed by a married woman, even when it was joined in by her husband, was an absolute nullity unless it was acknowledged in the precise manner prescribed by the statute, which could only be proven by the certificate of the officer duly endorsed on or annexed to the conveyance. It was the acknowledgment of the wife, which was the operative act to pass the title, and not the signing or delivering of the deed. (*Hogan* v. *Hogan,* 89 Ill. 427.) Under this statute it was held that a married woman would not be compelled to convey her land under any contract she made, alone or jointly with her husband, even though she had been paid the full value of the land as purchase money. (*Spurck* v. *Crook,* 19 Ill. 415; *Moulton* v. *Hurd,* 20 id. 137; *Russell* v. *Rumsey,* 35 id. 362; *Rogers* v. *Higgins,* 48 id. 211; *Hogan* v. *Hogan, supra.*) The act of February 21, 1861, which was the first of a series of enactments intended to enlarge the property rights of married women, had no effect, by express provision, to change the law in regard to contracts or conveyances of married women in relation to their separate property. They were still required, as before, to be joined in by the husband and the execution proven by the statutory certificate of acknowledgment. (*Cole* v. *VanRiper,* 44 Ill. 58; *Bressler* v. *Kent,* 61 id. 426; *Lewis* v. *Graves,* 84 id. 205; *Board of Trustees* v. *Davison,* 65 id. 124.) A married woman could not, after the passage of the act of 1861, be compelled, in equity,

to specifically perform her contract to convey, because she was not competent to make such a contract. *Oglesby Coal Co. v. Pasco,* 79 Ill. 164.

The act of 1861 had a marked effect upon the right of a married woman to control, hold, own and possess both real and personal property which she might own at the time of her marriage or thereafter acquire in good faith from any person other than her husband, by descent, devise or otherwise, but this act did not, by express terms or by necessary implication, remove the disability of a married woman to enter into contracts binding upon her personally. (*Hogan* v. *Hogan, supra.*) While at common law a married woman could not enter into a contract that would bind her personally, it was always recognized that she might enter into· a contract, under certain restrictions, which would charge her separate estate in equity. (Page on Contracts, sec. 915, and cases there cited.) This right is said to result as an incident of enjoyment. The act of 1861 enlarged the meaning of "separate property" as well as the means by which it might be acquired, and there was, as a logical sequence of this, an enlargement of her rights to contract, which, by necessary implication, grew out of the enlarged right of enjoyment conferred by the statute, but her right to contract was still restricted to such contracts as were necessary or reasonably adapted to the complete enjoyment of her separate property, and was to a large extent governed by the nature, character and circumstances of the property. Thus, if her separate property consisted of a farm she could lawfully contract for its cultivation, for stock, and implements necessary and suitable for its successful cultivation. She could employ servants and laborers to cultivate her farm or she could make a valid contract for leasing. If she owned houses she could contract for the repair and rental of the same. These, and many other contracts that might be mentioned, she could, no doubt, lawfully make, provided they related to the enjoyment of her separate prop-

erty; (*Cookson* v. *Toole*, 59 Ill. 515;) but she could not bind herself upon a promissory note given for the debt of her husband, for the reason that such contract was not one falling within the implied capacity given by the statute. *Carpenter* v. *Mitchell*, 50 Ill. 470; *Cookson* v. *Toole, supra.*

The act of March 27, 1869, made another radical change in respect to the power of a married woman to convey her separate estate. After the enactment of this statute, the acknowledgment of her deed ceased to be the ·effective means of transferring her title. The certificate of acknowledgment under this statute was the same for a married woman as that required in case of a *feme sole*. It was the execution and delivery of the deed under this statute that passed the title, and its execution might be proven in other ways than by the certificate of the officer taking the acknowledgment. In short, after the passage of the statute of 1869 married women were placed upon the same footing, with respect to the alienation or disposition of their real estate, with unmarried women, with one single exception: It was still necessary that the husband join with her in the deed or other writing. It was by virtue of this statute that a married woman was given the power, by her husband joining with her, to make a valid contract in writing for the disposition of her lands, which was binding upon her and enforcible in equity. The one distinction between the power of married and unmarried women above pointed out was retained in the revision of the Conveyance act in 1872, and it was not until the ninth section of the act of March 30, 1874, concerning husband and wife, that a married woman was fully emancipated and clothed with all the rights in relation to her property that her husband possessed in relation to his or that was enjoyed by an unmarried woman.

In the light of the foregoing authorities it is apparent that the contract which is the basis of this action was utterly void at the date of its execution, in 1864. The contract

did not relate to the separate property of Mary McArthur. She had no separate property to which the contract could relate, and it is not such a contract as she could have made had she possessed separate property. The contract was not joined in by her husband. The contract being void when made, could not be ratified after the disability was removed. *Bank* v. *Loftis,* 133 Pa. St. 97; 7 L. R. A. 313; *Williams* v. *Paine,* 169 U. S. 55; Page on Contracts, sec. 331; *Brick* v. *Campbell, supra.*

It is argued that since a married woman had the capacity to make a valid will disposing of her separate property, the contract should be construed as an agreement to make a will and be upheld as such. To this view we cannot assent, however much the strong equities in appellant's favor might incline us to do so. The power of a married woman to make a valid will was conferred by section 1 of chapter 109, Revised Statutes of 1845, and is expressly limited to her "separate estate," real and personal. The words "separate estate," as used in this statute, did not include an estate acquired from her husband except where it was settled upon her by him before marriage, or after marriage in pursuance of an ante-nuptial contract providing for such settlement. (2 Kent, 173.) It is true, the act of 1861 was held to enlarge the power of a married woman to devise all her separate property; (*In re Tuller,* 79 Ill. 99;) still, property subsequently acquired by her from her husband could not, even under the enlarged construction given the statute of 1845, after the passage of the act of 1861 be regarded as her separate estate. Had Mary McArthur made a deed instead of a mere executory contract, it would have been void unless her husband had joined in it and it had been acknowledged by her as provided by the statute; had she made a will in 1864 it would have been ineffectual to dispose of anything except her separate property. How, then, can her executory agreement to do a thing be valid when she had no power to do the act required by the agreement?

There is no view that we are able to take of the contract in question which will sustain its validity. The decree below was the only one that could properly have been rendered.

There being no error in the record the decree is accordingly affirmed.

*Decree affirmed.*